UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **TPW MANAGEMENT, LLC**, <br><br> Plaintiff, <br><br> v. <br><br> **YELP INC.**, <br><br> Defendant. | Case No.  16-cv-03063-YGR <br><br> **ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION** <br><br> Re: Dkt. No. 68 |

Plaintiff TPW Management, LLC ("TPW") brings this action against defendant Yelp for alleged infringement of its registered trademark, "We Know Just the Place."  (Dkt. No. 1, "Compl.")  Specifically, TPW brings claims under the following causes of action:  (i) trademark infringement under the Lanham Act, 15 U.S.C. § 1114; (ii) unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); (iii) dilution of a famous mark under the Lanham Act, 15 U.S.C. § 1125(c); (iv) common law unfair competition trademark infringement; (v) unfair competition under Vermont Consumer Protection laws, 9 V.S.A. § 2453(a); (vi) Vermont common law for unjust enrichment and restitution; and (vii) an accounting of money received by Yelp as a result of its alleged infringement.

Now before the Court is TPW's motion for a preliminary injunction, seeking to enjoin Yelp's continued use of the phrase, "We Know Just the Place."  Having carefully considered the pleadings, the papers submitted on this motion, and oral arguments held on October 4, 2016, and for the reasons set forth below, the Court **DENIES** TPW's motion.[1]

---

[1]  TPW moved only for a preliminary injunction based on its argument that it is likely to succeed on the merits against Yelp as to its federal trademark infringement claim under the Lanham Act.  The Court therefore does not address whether a preliminary injunction should issue pursuant to TPW's other causes of action.

## I.  BACKGROUND

TPW is a family owned business that provides "professional community and property management, home services, vacation rentals, and real estate sales services."  (Compl. ¶ 2.) Currently, TPW provides "management, home services, vendor sourcing, rental management and booking, and sales to over 20,000 rental, sales[,] and service customers, 3000 resort homeowners, in 50 resort area community associations in New England" by connecting "community associations, homeowners, and rental consumers to these service providers."  (*Id.* at ¶¶ 9, 10.) Additionally, TPW "connects property owners to plumbers, electricians, painters, housekeepers, and other service providers," connects renters to rental properties, and also "recommends local restaurants, service providers, and local attractions to property owners and renters."  (*Id.* at ¶¶ 12–13.)  Furthermore, TPW alleges that it developed on online booking service on June 1, 2012, which places guests in rental properties.  (*Id.* at ¶ 18.)

TPW alleges that it markets these services to customers with its registered trademark, "We Know Just the Place" (the "Tagline").  (*Id.* at ¶ 15.)  TPW applied to register this Tagline on or about July 28, 2012 with its first use on October 1, 2010.  (*Id.* at ¶ 22.)  The U.S. Trademark Office approved its registration on March 26, 2013 for "Real estate services, namely vacation home rental management services, in Class 36."  (Dkt. No. 70-3, Carroccio Decl. Ex. 3; Compl. ¶ 21 & Ex. 1.)[2]  According to TPW, it uses the Tagline in "all service sectors and on line vacation rental and real estate sales websites."  (Compl. ¶ 27.)

TPW alleges that Yelp has infringed on its trademark in the Tagline.  The following allegations are relevant to that claim:

Both Yelp and TPW are "in the same business of sourcing local vendors/service providers for their customers as well as being in the 'booking' business."  (*Id.* at ¶¶ 49–56.)  Yelp, like TPW, also provides a means through which consumers can contact and connect with home service providers and vendors.  Additionally, Yelp also at one point facilitated booking hotel rooms and

United States District Court
Northern District of California

---

[2]  According to the Trademark Manual of Examining Procedure, Class 36 encompasses "services rendered in financial and monetary affairs and services rendered in relation to insurance contracts of all kind."  Trademark Manual of Examining Procedure § 1401.02(a).

other rental properties through its website by partnering with another company.

Starting in 2013, Yelp "initiated a multi-million dollar multi-media campaign" in which it "reli[ed] upon and featur[ed] the phrase, 'We Know Just the Place.'" (*Id.* at ¶ 42 & Ex. 11.) Yelp advertises nationally, including geographic regions in which TPW markets such as Vermont. (*Id.* at ¶ 43.) As a result of such advertising campaigns, TPW's "customers, employees, and vendors have begun to question whether TPW acquired Yelp or vice versa as the mark or slogan is identical and the services are similar." (*Id.* at ¶ 58.) TPW contends that the "trust and credibility TPW has developed with its customers and the public will be degraded by this confusion." (*Id.* at ¶ 63.)

TPW first became aware of Yelp's use of the Tagline on October 12, 2015 when one of its executives viewed Yelp's advertisement on television. (*Id.* at ¶ 45.) Subsequent to this initial discovery, TPW learned that Yelp had been promoting the Tagline "not only with TV advertisements, but online with YouTube, blogs, articles, press releases, and advertisements." (*Id.* at ¶ 46 & Ex. 12.) On October 19, 2015, Yelp filed an application with the U.S. Trademark Office to register its use of the Tagline as a trademark for use in "providing consumer information, namely compilations, rankings, ratings, reviews, referrals and recommendations relating to businesses, restaurants, service providers, events, public services and government agencies, parks and recreational areas, religious organizations and nonprofit organizations" under Class 35. (Dkt. No. 86-3, Lumpkin Decl. ¶ 3.)[3]

## II.   LEGAL STANDARD

A preliminary injunction is an extraordinary remedy, which should be granted only in limited circumstances and where the merits of the case plainly favor one party over the other. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

---

[3] According to the Trademark Manual, Class 35 covers "mainly services with the object of (1) helping in the working or management of a commercial undertaking, or (2) help in the management of the business affairs or commercial functions of an industrial or commercial enterprise, as well as services rendered by advertising establishments . . . by all means of diffusion and concerning all kinds of goods or services." Trademark Manual of Examining Procedure § 1401.02(a).

United States District Court
Northern District of California

1    The Court considers four factors when considering motions for a preliminary injunction,

2    namely whether:  (1) the moving party has demonstrated that it is likely to succeed on the merits;

3    (2) the moving party will suffer irreparable injury if the relief is denied; (3) the balance of the

4    hardships favor the moving party; and (4) the public interest favors granting relief.  *See Pom*

5    *Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (citing *Winter*, 555 U.S. at 20).

6    The plaintiff must make a threshold showing of likelihood of success on the merits and irreparable

7    harm, but a stronger showing on one element may offset a weaker showing on another.  *Alliance*

8    *for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–33 (9th Cir. 2011).  In that regard, the four

9    factors may be evaluated on a sliding scale:  "serious questions going to the merits and a balance

10   of hardships that tips sharply toward the plaintiff can support issuance of a preliminary injunction,

11   so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

12   injunction is in the public interest."  *Id*. at 1135 (internal quotations omitted).

13   The burden of showing a likelihood of success on the merits is "placed on the party

14   seeking to demonstrate entitlement to the extraordinary remedy of a preliminary injunction at an

15   early stage of the litigation, before the defendant has had the opportunity to undertake extensive

16   discovery or develop its defenses."  *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 714

17   *opinion amended on reh'g*, 508 F.3d 1146 (9th Cir. 2007).

18   **III.    DISCUSSION**

19          **A.    LIKELIHOOD OF SUCCESS ON THE MERITS**

20   The Lanham Act defines a trademark as "any word, name, symbol, or device, or any

21   combination thereof used by a person . . . to identify and distinguish his or her goods, including a

22   unique product, from those manufactured or sold by others and to indicate the source of the goods,

23   even if that source is unknown."  15 U.S.C. § 1127.  Thus, a trademark is anything that serves to

24   indicate the source of one company's goods and to distinguish them from the goods of others.  It

25   "is merely a convenient means for facilitating the protection of one's good-will in trade by placing

26   a distinguishing mark or symbol—a commercial signature—upon the merchandise or the package

27   in which it is sold."  *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 98 (1918).

28   The elements of a trademark infringement claim are:  (1) a valid, protectable ownership

4

United States District Court
Northern District of California

interest in a trademark; and (2) defendant's use of a mark similar to plaintiff's trademark in a manner that is likely to cause consumer confusion. *See* 15 U.S.C. § 1114(1). Likelihood of confusion is the central inquiry in the trademark infringement analysis: whether a "'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks" because of the similarities between the two marks. *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). "[B]ecause we are at the preliminary injunction stage, [plaintiff] must establish that it is likely to be able to show such a likelihood of confusion." *See Brookfield Comm'cs, Inc. v. W. Coast Entertainment Corp.*, 174 F.3d 1036, 1053 n.15 (9th Cir. 1999) (citing *Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 723 (9th Cir. 1985)). At this time, the Court is not making ultimate findings of fact. The discussion of infringement, and factual findings in that regard, is directed only towards TPW's likelihood of success on the merits. The Court thus addresses the two elements of a trademark infringement claim, in turn.

### 1. First Element: Valid Ownership Interest

To satisfy the first element of a trademark infringement claim, TPW must establish that it has a valid, protectable, ownership interest in the trademark at issue. 15 U.S.C. § 1114(1). "Registration of a mark is prima facie evidence of the validity of the mark, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in connection with the goods specified in the registration." *Pom Wonderful*, 775 F.3d at 1124 (citing 15 U.S.C. § 1115(a)). "When proof of registration is uncontested, the ownership interest element of a trademark infringement claim is met." *Id.* (citing *Sengoku Works Ltd. v. RMC Int'l Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996)).

Yelp does not dispute that TPW has a properly registered trademark in the Tagline. However, Yelp argues that the presumption of a protected ownership interest extends only as far as the goods specified in the registration. *See Applied Info. Scis. Corp. v. eBay, Inc.*, 511 F.3d 966, 970 (9th Cir. 2007) ("A registered trademark holder's protectable interest is limited to those goods or services described in its registration."). Here, Yelp argues, such registration was limited for use in "Real estate services, namely, vacation home rental management services, in Class 36."

United States District Court
Northern District of California

1    (Dkt. No. 70-3, Carroccio Decl. Ex. 3.)

2        Yelp's argument, however, is based on a misreading of the Ninth Circuit's decision in

3    *Applied Information Sciences*.  While the Ninth Circuit in *Applied Information Sciences* held that

4    the trademark holder's "protectable interest is limited to those goods or services described in its

5    registration," the Ninth Circuit clarified that an "owner's *remedies* against confusion with its valid

6    mark are not so circumscribed."  *Applied Info. Scis.*, 511 F.3d at 971 (emphasis in original).  The

7    relevant inquiry is not whether Yelp uses the mark with respect to the same goods or services as

8    TPW, but rather whether Yelp's "use of the mark on different goods or services is likely to cause

9    confusion with [TPW's] use of the mark in connection with its registered goods."  *Id.*  Thus, the

10    Ninth Circuit held that a "markholder's rights to protect its interest in a registered mark were not

11    limited to infringement actions against those using the mark in connection with the specified

12    goods or services."  *Id.* (citing *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107 (9th

13    Cir. 1999)).  "Having established a protectable interest by proving it is the owner of a registered

14    trademark, the owner does not additionally have to show that the defendant's allegedly confusing

15    use involves the *same* goods or services listed in the registration."  *Id.* at 972 (emphasis in

16    original); *see also Pom Wonderful*, 775 F.3d at 1124 (holding that where "proof of registration is

17    uncontested, the ownership interest of a trademark infringement claim is met").

18        Accordingly, because Yelp does not question the validity of TPW's registration of the

19    Tagline, the Court finds that TPW has established the first element of a trademark infringement

20    claim.

21           **2.  Second Element:  Likelihood of Confusion**

22        To establish the second element of a trademark infringement claim, TPW must establish

23    that Yelp's use of the Tagline is likely to cause consumer confusion.  15 U.S.C. § 1114(1).  In this

24    regard, courts in the Ninth Circuit consider eight factors:  (a) similarity of the conflicting

25    designations; (b) relatedness or proximity of the two companies' products or services; (c) strength

26    of the mark; (d) marketing channels used; (e) degree of care likely to be exercised by purchasers in

27    selecting goods; (f) defendant's intent in selecting the mark; (g) evidence of actual confusion; and

28    (h) likelihood of expansion in product lines (the "*Sleekcraft* factors").  *Interstellar*, 184 F.3d at

1109–10 (citing *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)).

The *Sleekcraft* factors are not intended to be applied mechanically, but rather, courts consider "what each factor, and—more importantly—what the analysis as a whole, reveals about the ultimate question," i.e. "the likelihood of consumer confusion as to the origin of the product or service bearing the allegedly infringing mark." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002); *see also Network Automation, Inc. v. Adv. Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011) ("The *Sleekcraft* factors are intended as an adaptable proxy for consumer confusion, not a rote checklist."). "In a close case amounting to a tie, doubts are resolved in favor of the senior user." *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1404 n.14 (9th Cir. 1997).

The Court thus next turns to an analysis of each of the *Sleekcraft* factors to determine whether TPW is likely to establish a likelihood of confusion between Yelp's use of the Tagline and its own use.[4]

### a.  Factor One:  Similarity of the Marks

In analyzing the first factor, the Ninth Circuit employs the following framework:  "[F]irst, the marks must be considered in their entirety and as they appear in the marketplace; second, similarity is adjudged in terms of appearance, sound, and meaning; and third, similarities are weighed more heavily than differences." *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000) (internal citations omitted).  The greater the degree of similarity between the two marks at issue, the greater the likelihood of confusion.  *Id.*

Here, there is no dispute that the two marks are completely identical in terms of appearance, sound, and meaning.  Both TPW and Yelp use the exact same phrase—"We Know

---

[4]  TPW argues that in cases involving the internet, the Ninth Circuit has recognized that the most important *Sleekcraft* factors are the similarity of the marks, the relatedness of the goods or services, and the use of the internet as a marketing channel.  The Ninth Circuit has, however, recently reversed course:  "Given the multifaceted nature of the Internet and the ever-expanding ways in which we all use the technology, however, it makes no sense to prioritize the same three factors for every type of potential online commercial activity." *Network Automation*, 638 F.3d at 1148.  The Ninth Circuit reaffirmed that the *Sleekcraft* factors should be "applied flexibly, particularly in the context of Internet commerce." *Id.*

United States District Court
Northern District of California

Just the Place"—to convey that each company has knowledge or information that consumers can rely on.  TPW argues that this is sufficient to find that this factor weighs heavily in favor of finding a likelihood of confusion between the two uses of the Tagline.  *See Cent. 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1998); *Sinhdarella, Inc. v. Vhu*, No. 07-CV-4353-WHA, 2008 WL 410246, at *4 (N.D. Cal. Feb. 12, 2008) (finding that the use of the same words guarantees confusion); *Sleekcraft*, 599 F.2d at 352 ("Closeness in meaning can itself substantiate a claim of similarity of trademarks.").

Such would be true if the Court's analysis were limited to reviewing the competing uses of the Tagline in isolation.  However, the Court must consider the marks in their "entirety and as they appear in the marketplace."  *GoTo.com*, 202 F.3d at 1206.  The exhibits submitted by TPW demonstrate that both Yelp and TPW pair the Tagline with their own unique logos and/or company names:




(Dkt. No. 70-4 at 7; Dkt. No. 72-6 at 2; *see also* Dkt. No. 73-2 (Google search results for "we know just the place rentals"); Dkt. No. 75-7 at 11 (Youtube.com search results for "we know just the place"); Dkt. No. 75-7 at 19 (Facebook search results for "#weknowjusttheplace").)  Such pairing greatly reduces, if not completely eliminates, the risk of confusion that arises from the similarity of the marks.  The Ninth Circuit's decision in *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002) is instructive.  The plaintiff in *Cohn* was a veterinarian in Boise, Idaho, who operated a clinic named "Critter Clinic."  *Id.* at 839.  To advertise his services, the plaintiff began using the slogan, "Where Pets are Family."  *Id.*  A year after plaintiff began using such slogan, Petsmart also began using the exact, same slogan to promote its national chain of pet supplies stores, including in Boise.  *Id.*  Although Petsmart does not normally offer veterinary services, its Boise store partnered with a local veterinarian to do so, and Petsmart advertised the availability of such.  *Id.*  Nevertheless, the Ninth Circuit held that the there was no likelihood of confusion because consumers "will actually encounter the trademarks differently in the marketplace."  *Id.* at

United States District Court
Northern District of California

1    842.  The Ninth Circuit explained that a "critical factor [in *Cohn*] is that both parties use the

2    trademark merely as a tagline to their distinctive business names."  *Id.*  Thus, the emphasis on

3    these "housemarks has the potential to reduce or eliminate the likelihood of confusion."  *Id.*

4    (internal citations and quotations omitted).

5         Similarly, the evidence submitted by TPW overwhelmingly demonstrates that the Tagline

6    is paired with the company name and logo of each respective company.[5]  On this ground,

7    therefore, the instant matter is indistinguishable from *Cohn*.[6]  Accordingly, the Court finds that

8    this factor weighs heavily against finding a likelihood of confusion.

9         **b.  Factor Two:  Relatedness of the Fields or Proximity of the Services**

10        The Ninth Circuit assesses the proximity of the goods or services by analyzing whether

11   they are complementary, sold or offered to the same class of consumers, and are similar in use and

12   function.  *Network Automation*, 638 F.3d at 1150.  "[T]he danger presented is that the public will

13   mistakenly assume there is an association between the producers of the related goods, though no

14   such association exists."  *Sleekcraft*, 599 F.2d at 350.  "Related goods are generally more likely

15   than unrelated goods to confuse the public as to the producers of the goods."  *Brookfield*, 174 F.3d

16   at 1055–56.  If, on the other hand, the parties "did not compete to any extent whatsoever, the

17   likelihood of confusion would probably be remote."  *Id.*

18        TPW argues that this factor should weigh in favor of a likelihood of confusion because

19   TPW and Yelp provide the following related services:  (1) consumer referrals for real estate

20   listings, rentals, accommodations, and lodging; (2) access to service providers and home services

21   through TPW's "Maintenance Request" feature and Yelp's "Request a Quote" feature; and (3)

22

23        [5]  TPW argues that Yelp at times uses the Tagline in isolation as a "hashtag."  However,
     TPW offered no evidence in support of this assertion.  Rather, the exhibits submitted by TPW
24   demonstrate that each company uses the Tagline in connection with their respective company
     names, logos, or both.  (*See* Dkt. No. 76-3.)
25

26        [6]  TPW attempts to distinguish *Cohn* by arguing that the Ninth Circuit's decision was
     actually based on its finding that the veterinarian and Petsmart operated in unrelated fields.  To the
27   contrary, the Ninth Circuit held that the "parties indisputably sell related goods and services" and
     based its decision on the "critical factor" that "both parties use the trademark merely as a tagline to
28   their distinctive business names."  *Cohn*, 281 F.3d at 842.

United States District Court
Northern District of California

booking services for lodging and accommodations.  (Carroccio Decl. ¶¶ 39–50.)

Yelp counters that the services it offers differ substantially from those offered by TPW, and therefore should not be considered "related."  With respect to consumer referrals, Yelp unlike TPW, only provides a platform for consumers to offer feedback.  TPW, on the other hand, compiles consumer data based on "customer satisfaction, vendor/service qualifications . . . and cost," and on those bases, "rates each service experience for each provider."  (Carroccio Decl. ¶ 9.)  With respect to providing access to service providers and home services, Yelp argues that Yelp only provides a means by which consumers can reach out to the vendor or business directly, whereas TPW manages the requests itself.  Additionally, Yelp explained that it makes no revenue from its "Request a Quote" service, the vendors may opt-in to the feature free of charge, and Yelp offers no preferential treatments to the vendors who utilize the "Request a Quote" feature. (*Compare* Carroccio Decl. ¶ 11 *with* Osborn Decl. ¶¶ 12–13.)  Finally, with respect to providing booking services for rentals and accommodations, Yelp explains that it does not currently offer those services, nor did it ever directly allow consumers to book lodgings through Yelp's site.[7]

The Court finds that Yelp's focus on specific differences between the companies' offerings too narrowly defines the scope of this *Sleekcraft* factor.  The relevant inquiry is not whether the two companies provide the exact same services, but rather whether the "consuming public is likely somehow to associate" the products offered by TPW and Yelp.  *Sleekcraft*, 599 F.2d at 350 ("[T]he danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists.").  The court's decision in *Palantir Techs. Inc. v. Palantir.net, Inc.*, No. 07-CV-03863-CRB, 2008 WL 152339 (N.D. Cal. Jan. 15, 2008) was similar.  There, Palantir.net offered "website design services and custom computer services," whereas Palantir Technologies was not involved in website design or in the provision of customer computer services.  *Id.* at *5.  Rather, Palantir Technologies had developed

---

[7]  Yelp avers that in 2014, it partnered with Hipmunk, Inc. such that visitors to Yelp's website could "access the Hipmunk platform to book rooms at hotels listed on Yelp.  (Dkt. No. 86-2, Curzon Decl. ¶ 10.)  According to Yelp, it ended this relationship with Hipmunk for business reasons unrelated to this lawsuit, and such features are no longer available on Yelp's site. (*Id.* at ¶ 12.)

United States District Court
Northern District of California

United States District Court
Northern District of California

software programs for specialized use by a select group of clients.  *Id.*  Nevertheless, the court found that the relatedness of the services provided by the two companies weighed in favor of finding a likelihood of confusion because both provided clients the "ability to manage and analyze data through software."  *Id.* at *6.  Similarly here, although Yelp and TPW provide different methods for providing consumers with ratings of different accommodations and service providers, both provide consumers with a means by which to rate and assess different offerings in the market.  *See, e.g.*, *Nat'l Customer Eng'g Inc. v. Lockheed Martin Corp.*, No. 96-CV-8938-DDP, 1997 WL 363970, at *4 (C.D. Cal. Feb. 14, 1997) (noting that the companies "need only be related in some manner, or the conditions surrounding their marketing be encountered by the purchaser under circumstances that could give rise to the mistaken belief that the goods come from a common source").

However, the Court notes that the differences in the services offered by TPW and Yelp do impact the weight of this factor in the overall likelihood of confusion analysis.  The Court finds it unlikely that a consumer would confuse the curated referrals and ratings offered by TPW with the free-form, consumer rating-based platform offered by Yelp.  *See Pinterest, Inc. v. Pintrips, Inc.*, 140 F. Supp. 3d 997, 1011–12 (N.D. Cal. 2015) (finding no proximity between an online tool for tracking airline prices and a social media website for sharing information).  Similarly, the Court finds it unlikely that a consumer would confuse TPW's "Maintenance Request" feature and TPW's "Request a Quote" feature as each provides access to service providers in significantly different ways.  *See Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1126 (S.D. Cal. 2014) (finding no proximity where "Hangouts" provided real-time video capabilities whereas "Hanginout" only offered pre-recorded messaging and video features).

Accordingly, while the Court finds that the services provided by TPW and Yelp are related in the sense that they both provide consumers access to information about service providers, vendors, rentals, and homes, because both do so in significantly different ways, this factor weighs only slightly in favor of finding a likelihood of confusion.

### c.  Factor Three:  Strength of the Mark

The "strength" of a trademark is evaluated both in terms of its conceptual strength and its

11

1    commercial strength.  A mark's "conceptual strength depends largely on the obviousness of its

2    connection to the good or service to which it refers."  *JL Beverage Co., LLC v. Jim Bean Brands*

3    *Co.*, 828 F.3d 1098, 1107 (9th Cir. 2016) (internal citation and quotation omitted).  "To determine

4    a mark's conceptual strength, [the Ninth Circuit] classif[ies] a mark along a spectrum of five

5    categories ranging from strongest to weakest:  arbitrary, fanciful, suggestive, descriptive, and

6    generic."  *Id.*  Commercial strength is based on "actual market recognition."  *Network Automation*,

7    638 F.3d at 1149.  The more likely a mark is to be remembered and associated in the public mind

8    with the mark's owner, the greater the likelihood of confusion.  *Brookfield*, 174 F.3d at 1058

9    (citing *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992)).

10   With regards to the "conceptual" strength of the mark, the parties agree that at best, the

11   Tagline is "suggestive."  The Court, however, finds that the mark does not rise to the level of a

12   suggestive mark, but is rather only a "descriptive" mark because it merely describes the nature of

13   the service provided.  It takes little to no stretch of the imagination to connect the Tagline with the

14   referral services provided by TPW and Yelp.  *See Surfvivor*, 406 F.3d at 632 (defining

15   "descriptive" marks as those that do "not require any exercise of the imagination").  In either

16   event, the mark would only be entitled to moderate protection.  *Brooklyn Brewery Corp. v. Black*

17   *Ops Brewing, Inc.*, 156 F. Supp. 3d 1173, 1179 (E.D. Cal. 2016) (explaining that generic marks

18   are afforded no protection whereas descriptive or suggestive marks are given only moderate

19   protection); *Brookfield*, 174 F.3d at 1058 (holding that "suggestive marks are presumptively

20   weak").  As a descriptive mark, such protection would be warranted only if the Tagline "acquired

21   sufficient 'secondary meaning' to create an association between the mark and the product."

22   *Surfvivor*, 406 F.3d at 632.  Here, TPW has made no showing that the mark has acquired any such

23   secondary meaning.

24   With regards to the "commercial" strength of the mark, TPW offers two arguments:  First,

25   TPW argues that its investment of $2.2 million in the mark is sufficient to transform a suggestive

26   mark into a strong mark.  *See Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1211 (9th

27   Cir. 2012) (reversing summary judgment holding that a jury could have afforded more weight to

28   this factor given plaintiff's investment in the mark).  Second, TPW argues that Yelp's investment

12

United States District Court
Northern District of California

1    in the Tagline converts it into a stronger mark, overcoming the "presumption that a suggestive

2    mark is weak and undeserving of protection." *Masters Software, Inc. v. Discovery Comm'cs, Inc.*,

3    725 F. Supp. 2d 1294, 1300 (W.D. Wa. 2010).

4         However, focusing only on the amount of money spent by each respective party in

5    developing and using the Tagline is not conclusive as to the commercial strength of the mark.  The

6    focus of the analysis must be on "actual marketplace recognition." *Network Automation*, 638 F.3d

7    at 1150.  While advertising expenditures are relevant and "can transform a suggestive mark into a

8    strong mark," *see Brookfield*, 174 F.3d at 1058, the Court finds that here, TPW has not shown that

9    TPW's or Yelp's investment in the Tagline has resulted in strong marketplace recognition of the

10   Tagline.

11        Accordingly, the Court finds that this factor weighs against a likelihood of confusion.

12             **d.  Factor Four:  Marketing Channels Used**

13        In assessing the impact of this factor, courts "consider whether the parties' customer bases

14   overlap and how the parties advertise and market their products." *Pom Wonderful*, 775 F.3d at

15   1130.  "Marketing channels can converge even when different submarkets are involved so long as

16   the 'general class . . . of purchasers exposed to the products overlap.'" *Id.* (quoting *Sleekcraft*, 599

17   F.2d at 353).

18        TPW and Yelp's advertising can be divided into two broad categories:  internet-based and

19   non-internet based.

20        With respect to their internet advertising, TPW argues that this factor should weigh in

21   favor of finding a likelihood of confusion because both companies utilize a variety of social media

22   sites including Facebook, Youtube, and Twitter, and appear on search results together on Google.

23   (Dkt. No. 70, Carroccio Decl. ¶¶ 15, 42, 53–56.)  TPW contends that the use of the internet for

24   marketing increases the likelihood of confusion because it "allows for competing marks to be

25   encountered at the same time, on the same screen." *GoTo.com*, 202 F.3d at 1207.  However, the

26   Ninth Circuit has acknowledged that the increased use of the internet in recent years has

27   diminished the likelihood of confusion that arises from the shared use of the internet as a

28   marketing channel.  In *Network Automation*, the Ninth Circuit explained that it would be the "rare

13

commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion." *Network Automation*, 638 F.3d at 1151. Thus, the Court finds that TPW and Yelp's shared use of the internet bears little weight in the overall likelihood of confusion analysis.

With respect to their non-internet based advertising, TPW focuses advertising on sponsorships, brochures, and in-person connections, as well as through local television commercials. (Dkt. No. 70, Carroccio Decl. ¶¶ 15–16.) Yelp, on the other hand, focuses on targeting a national audience through national television and radio commercials. (Dkt. No. 86-1, Osborn Decl. ¶ 8.) Yelp contends that because it, unlike TPW, targets a national audience through its non-internet based advertising, there is no marketing channel convergence. However, that Yelp targets a broader audience does not lead to the conclusion that the marketing channels utilized by each company do not overlap. For instance, in *Pom Wonderful*, the Ninth Circuit found that the marketing channels overlapped even though one company advertised its products in a "much broader range of outlets." *Pom Wonderful*, 775 F.3d at 1131. Similarly here, although Yelp targets a broader area, both Yelp and TPW's television advertisements air in overlapping regions, such as southern Vermont. (Dkt. No. 70, Carroccio Decl. ¶ 52.) The problem remains though that the marketing channels do not use the Tagline exclusively but in conjunction with the parties' principle names, i.e., TPW or Yelp. Plaintiff has failed to show how the marketing channel has been impacted by the Tagline itself. At most, the Court finds that Yelp's and TPW's use of television advertisements as a marketing channel overlaps only with respect to the areas in the northeast where TPW television ads air. Again, at most, this factor weighs slightly in favor of finding a likelihood of confusion here, and only in a more narrow market.

### e.  Factor Five:  Degree of Care Likely Exercised by Consumers

Generally, in assessing the likelihood of confusion with respect to this factor, the "standard used by the courts is the typical buyer exercising ordinary caution." *Network Automation*, 638 F.3d at 1152. "When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely. Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases." *Id.* With respect to consumers utilizing

the internet, the Ninth Circuit has acknowledged that the "default degree of consumer care is becoming more heightened as the novelty of the [i]nternet evaporates and online commerce becomes commonplace." *Id.* Thus, the "nature of the goods [and services] and the type of consumer is highly relevant to determining the likelihood of confusion." *Id.*

Here, TPW argues that the consumers that utilize its and Yelp's services are ordinary homeowners seeking home services or property maintenance referrals or ordinary consumers interested in purchasing or renting lodging or vacation properties. TPW asserts that these consumers are not likely to be real estate professionals. TPW, however, offers no support for its conclusions about the consumers of TPW or Yelp.

Yelp, on the other hand, avers that its own consumers are relatively affluent, sophisticated, and technologically savvy. (Dkt. No. 86-2, Curzon Decl. ¶¶ 8, 9 (indicating that 27.3% of Yelp users earn between $60,000 and $90,000, 38.6% earn more than $100,000, and approximately 80% have at least a college education).) Additionally, Yelp argues that, at least with respect to TPW's vacation home rentals and sales, its customers are likely to exercise a high degree of care given that such purchases are likely to be rather expensive. *Network Automation*, 638 F.3d at 1153 ("We further explained that we expect consumers searching for expensive products online to be even more sophisticated."); *Adidas Am., Inc. v. Sketchers USA, Inc.*, 149 F. Supp. 3d 1222, 1243 (D. Oregon 2016) ("A more expensive product begets a more sophisticated customer whom courts expect to exercise a higher degree of care.").

In light of Yelp's statistics regarding its users and the types of services and goods TPW offers, and in light of the Ninth Circuit's acknowledgement that the degree of care of consumers utilizing the internet has become more heightened, the Court finds on this record that the consumers of each company are likely to exercise a high degree of care. Accordingly, this factor weighs against a finding of a likelihood of confusion.

### f.  Factor Six:  Yelp's Intent in Selecting the Mark

With respect to the factor of intent, the inquiry focuses on whether Yelp adopted the Tagline with an intent to deceive the public as to the source of the services or goods that it offers. *See Interstellar Starship*, 184 F.3d at 1111. "[W]here the alleged infringer adopted his mark with

knowledge, actual or constructive, that it was another's trademark, resolution of this factor favors" the senior user. *Surfvivor*, 406 F.3d at 634; *see also Sleekcraft*, 599 F.2d at 354 (holding that when the "alleged infringer knowingly adopts a mark similar to another's reviewing courts presume that the defendant can accomplish" the purpose of deceiving the public).

Here, the parties do not dispute that Yelp was aware of TPW's use of the Tagline prior to Yelp's use of the mark. TPW argues that this alone is sufficient to tip this factor in favor of finding a likelihood of confusion. *See Surfvivor*, 406 F.3d at 634.

However, the Court's analysis does not end once it determines that the junior user was aware of the senior user's use of the mark. The relevant inquiry is whether the junior user adopted the mark "deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 158 (9th Cir. 1963). The Ninth Circuit's decision in *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073 (9th Cir. 2005) is instructive. There, the defendant was aware of the plaintiff's use of the mark prior to adopting it for its own purposes. *Id.* at 1085. The attorney for defendant believed that the company "could 'carve out' a non-infringing mark, even with the existence of [plaintiff's] mark." *Id.* On that basis, the Ninth Circuit held that the district court did not err in finding that the intent factor weighed in favor of defendant because there was no showing of an intent to capitalize on the plaintiff's use of the mark. *Id.*

Here, Yelp averred that prior to adopting the Tagline, it consulted with counsel and determined that consumers were unlikely to be confused by Yelp's use of the Tagline, despite TPW's use and registration of the phrase. (Dkt. No. 86-1, Osborn Decl. ¶3.) Thus, rather than intending to deceive the public, Yelp avers that it intended to utilize the mark in a manner that was unlikely to confuse consumers. Given the presumptions afforded a senior holder when balanced with the lack of any evidence of intent to actually deceive the public, the Court finds this factor neutral. *See M2 Software*, 421 F.3d at 1085.

### g.  Factor Seven:  Evidence of Actual Confusion

The Ninth Circuit has held that a "showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion." *Network Automation*, 638

1    F.3d at 1151 (quoting *Playboy Enters., Inc. v. Netscape Comm'cs Corp.*, 354 F.3d 1020, 1026 (9th

2    Cir. 2004)).

3          Here, TPW concedes that it has no evidence of actual confusion.[8]  However, at this stage

4    of the proceedings, the importance of this factor is diminished given the difficulty of acquiring

5    evidence of actual confusion.  *Id.*; *see also Deckers Outdoor Corp. v. Ozwear Connection Pty.*

6    *Ltd.*, No. 14-CV-2307-RSWL, 2014 WL 4679001, at *7 (C.D. Cal. Sept. 18, 2014) (noting that the

7    failure to provide instances of actual confusion is not dispositive and the factor is heavily weighed

8    "only when the particular circumstances of the case indicate that such evidence should have been

9    available and proven").

10         Accordingly, the Court finds that this factor weighs slightly in favor of Yelp given that

11   such evidence is rarely available at this stage of the proceedings.

12                  **h.  Factor Eight:  Likelihood of Expansion to Other Product Lines**

13         "A strong likelihood that either party may expand his business to compete with the other

14   favors a finding of infringement."  *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th

15   Cir. 1993).  "The question is whether the parties are likely to compete with a similar product in the

16   same market."  *Id.*  Where the parties "already compete to a significant degree" and "use similar

17   marketing channels, this factor is relatively unimportant to the likelihood of confusion analysis."

18   *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1182 (C.D. Cal.

19   2010).

20         Here, neither party has submitted evidence that either TPW or Yelp is likely to expand

21   their operations.  However, as discussed above, the parties already compete, at least to some

22   degree, in related fields and use similar marketing channels.  Thus, the Court finds that this factor

23   is, at best, neutral in the likelihood of confusion analysis.  *See id.* at 1182.

---

[8]  In its motion for preliminary injunction, TPW initially argued that this factor should weigh in its favor on the basis of its averment that one customer commented that he was confused about the association between Yelp and TPW.  However, at oral argument, TPW conceded that it lacked actual evidence of confusion at this time.

United States District Court
Northern District of California

### i.   Summary of *Sleekcraft* Factors

The Court does not weigh these factors mechanistically, but rather considers "what each factor, and—more importantly—what the analysis as a whole, reveals about the ultimate question," i.e. "the likelihood of consumer confusion as to the origin of the product or service bearing the allegedly infringing mark." *Entrepreneur Media, Inc.*, 279 F.3d at 1141.  Here, the Court finds that, especially given the weakness of the mark (factor three) and in light of how the mark is actually encountered by consumers in the marketplace (factor one), TPW has not demonstrated a likelihood of confusion at this stage of the proceedings.  The only two factors that arguably weigh in favor of a likelihood of confusion bear little weight here:  With regards to overlaps in a related market (factor two), the significant differences between the services provided by TPW and Yelp minimize the likelihood of confusion.  With regards to marketing channels (factor four), the shared use of the internet has little probative value and the shared use of television ads is limited only to the geographical regions where TPW television ads air.  Thus, the Court finds that TPW has failed to carry its burden of showing a likelihood of success on the merits as required for a motion for a preliminary injunction.

Nevertheless, because the preliminary injunction factors are weighed on a sliding scale in the Ninth Circuit, the Court proceeds with a determination of whether TPW has demonstrated a likelihood of irreparable harm.

### B.   LIKELIHOOD OF IRREPARABLE HARM

To obtain a preliminary injunction, TPW must "demonstrate a likelihood of irreparable injury," more than a mere possibility.  *Winter*, 555 U.S. at 21.  To establish a likelihood of irreparable harm, conclusory or speculative allegations are not enough.  *See Herb Reed Enters., LLC v. Florida Entertainment Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013) (holding that pronouncements "grounded in platitudes rather than evidence" are insufficient); *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (holding that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction" and adding that a "plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief").  Irreparable injury means an injury that is imminent,

and that cannot be remedied by an award of money.

Misidentification of goods or services poses a threat to goodwill and reputation. A trademark holder is entitled to control the reputation and goodwill associated with its mark. This potential loss of goodwill or loss of control over one's reputation cannot be measured precisely and "may constitute irreparable harm for purposes of preliminary injunctive relief." *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 846 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012) (quoting *Mortgage Elec. Registration Sys. v. Brosnan*, No. 09-CV-3600-SBA, 2009 WL 3647125, at *8 (N.D. Cal. Sept. 4, 2009)); *see also Apple Computer, Inc. v. Formula Intern. Inc.*, 725 F.2d 521, 525–26 (9th Cir. 1984) (finding irreparable harm where continuing infringement would "result in loss of control over Apple's reputation and loss of goodwill"); *Brooklyn Brewery*, 156 F. Supp. 3d at 1185 (stating that irreparable injury may include "loss of control of reputation, loss of trade, and loss of goodwill" even when the junior user "does not tarnish [the reputation]" or "divert any sales by its use").

TPW's claims of irreparable harm can be broken into two categories: First, TPW claims that because of its association with Yelp, it will lose "potential and existing rental customers, real estate customers, and repeat customers," who will confuse the "review and comments on the Yelp site and mistake them for TPW recommendations." (*See* Dkt. No. 70, Carroccio Decl. ¶¶ 76–82.) Second, TPW claims that Yelp's use of the Tagline has caused, and will continue to cause, TPW to lose control over its trademark and its reputation. (*See id.* at ¶ 65.)

With regards to the first category of harms TPW claims it will suffer, TPW offers no actual evidence of such harm. The only exhibits TPW attached in support of its claims are two articles that are critical of Yelp. However, this is insufficient to demonstrate the "immediate threatened injury," which is a prerequisite for a preliminary injunction. *Caribbean Marine Servs.*, 844 F.2d at 674. Yelp has been using the Tagline since 2013, yet TPW offers no evidence of diminished revenues, actual customer confusion, or any customers lost as a result of Yelp's use of the Tagline. Such speculative allegations are insufficient to demonstrate even a threshold showing of irreparable harm. *See Herb Reed Enters.*, 736 F.3d at 1251 (holding that pronouncements "grounded in platitudes rather than evidence" are insufficient).

United States District Court
Northern District of California

1    With regards to the second category of irreparable injury TPW may suffer, TPW argues

2    that Carroccio's averments in his declaration are sufficient to establish that TPW is likely to suffer

3    a loss of control over its trademark and its reputation.  TPW primarily relies on the court's

4    decision in *E&J Gallo Winery v. Grenade Beverage LLC*, No. 13-CV-00770-SAB, 2014 WL

5    4073241 (E.D. Cal. Aug. 15, 2014) in support of its position.  In *E&J Gallo*, the court found that

6    the declaration of plaintiff's director of marketing was sufficient to establish, for purposes of a

7    summary judgment motion seeking a permanent injunction, the likelihood of irreparable injury

8    where the declaration averred that an association with defendant's product would be harmful to

9    plaintiff's reputation.  *Id.* at *14.

10   At least one other court, however, has found the result in *E&J Gallo* to be irreconcilable

11   with the Ninth Circuit's decision in *Herb Reed Enterprises*.  *See Pom Wonderful LLC v. Pur*

12   *Beverages LLC*, No. 13-CV-6917-MMM, 2015 WL 10433693, at *16 (C.D. Cal. Aug. 6, 2015)

13   ("*Pom II*").  Prior to *Herb Reed Enterprises*, plaintiffs enjoyed the presumption that they would

14   suffer irreparable harm in trademark infringement actions after establishing a likelihood of

15   confusion.  *Herb Reed Enters.*, 736 F.3d at 1250–51.  *Herb Reed Enterprises* specifically

16   abrogated such presumption holding that gone "are the days when '[o]nce a plaintiff in an

17   infringement action has established a likelihood of confusion, it is ordinarily presumed that the

18   plaintiff will suffer irreparable harm if injunctive relief does not issue.'"  *Id.*  The Ninth Circuit

19   further held that those "seeking injunctive relief must proffer *evidence* sufficient to establish a

20   likelihood of irreparable harm."  *Id.* (emphasis supplied).  In discussing *E&J Gallo* in light of the

21   Ninth Circuit's decision in *Herb Reed Enterprises*, the *Pom II* court found that adopting *E&J*

22   *Gallo*'s approach would result in a finding of irreparable harm in any case where plaintiff was able

23   to demonstrate a likelihood of success on the merits, the very practice *Herb Reed Enterprises* held

24   was no longer appropriate.  *Pom II*, 2015 WL 10433693, at *16.  This Court agrees.  Accepting

25   Carroccio's averments regarding TPW's potential loss of control over the Tagline and its

26   reputation would necessarily collapse the likelihood of confusion and the irreparable harm

27   analyses, in direct contravention to the law in the Ninth Circuit.

28   Accordingly, the Court finds that TPW has failed to demonstrate a likelihood of irreparable

injury.  Because TPW has failed to make threshold showings of likelihood of success and likelihood of irreparable injury, the Court need not address the remaining factors for determining whether a preliminary injunction should issue.  *See Alliance for Wild Rockies*, 632 F.3d at 1131–35; *see also Pom II*, 2015 WL 10433693, at *18 (finding no need to address remaining factors because it found that plaintiff failed to adduce evidence of irreparable harm); *ET Trading, LTD v. ClearPlex Direct, LLC*, No. 15-CV-00426-LHK, 2015 WL 913911, at *3 (N.D. Cal. Mar. 2, 2015) ("The Court need not address all of the *Winter* factors because the Court finds that [p]laintiff has failed to carry its burden of demonstrating that it will be irreparably harmed absent a temporary restraining order.").  The Court thus **DENIES** TPW's motion for a preliminary injunction.

## IV.       CONCLUSION

For the aforementioned reasons, the Court **DENIES** TPW's motion for a preliminary injunction.  However, in light of the allegations alleged, the Court will set an early trial date by separate order.

This Order terminates Docket Number 68.

**IT IS SO ORDERED.**

Dated: October 25, 2016

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**